JEREMY F. GILMER, Captain of Engineers in the United States Army and Special Agent for said United States v. A Certain Tract of Land, known as " Lime Point," SAMUEL R. THROCKMORTON, Owner, and all whom it may concern.

The Act of the Legislature of this State of Feb. 14th, 1859, entitled an act " To provide for the relinquishment to the United States, in certain cases of title in lands for sites of light-houses and for other purposes, on the coasts and waters of this State," and authorizing proceedings at the instance of the United States in a Court of this State, to condemn land within the State for a United States fort or other military or naval purposes, is constitutional. To condemn land in this way and for such purposes, is to take "private property" for "public uses," within the meaning of section eight, article one, of the Constitution of California.

The right to take private property for public uses—that is, the right of eminent domain—is inherent in Government. The State possesses this right as one of the rights of sovereignty.

The words " public use," in the eighth section of article one of our Constitution, mean a use which concerns the whole community, as distinguished from a particular individual or a particular number of individuals. But it is not necessary that each and every individual member of society should have the same degree of interest in this use, or be personally or directly affected by it, in order to make it public.

If the use for which the property is taken be to satisfy a great public want or public exigency, it is a public use in the meaning of the Constitution, and the State is not limited to any given mode of applying that property to satisfy the want or to meet the exigency. The power which is authorized to take is also empowered to appropriate, or apply the thing taken to the use designated. Hence it may itself make the application, or it may make it through the instrumentality of others.

Authorities cited to the point, that in determining whether the exercise of this power be proper in a given case, the Legislature is the conclusive judge of the public necessity or advantage.

A " fort" is an object of " public use," and a State may, for its own purposes, condemn land for a fort, or may authorize the land to be condemned for such purpose, for and on behalf of the Federal Government.

The only test of the admissibility of the power of the State to condemn land for "public use" is, that the particular object for which the land is condemned tends to promote the general interest, in its relation to any legitimate object of Government. In the promotion of this purpose, the State selects its own agents and agencies; and whether that agency be a foreign or domestic corporation, and a fortiori a foreign Government, or a member of the domestic Government, is immaterial.

Assuming that the Federal Government has the power to condemn private land

within a State for the purposes of a "fort," still that power is not *exclusive* of the power of the State.

The power of a State to aid the Federal Government in the execution of the undisputed powers of the latter, by lending her credit or her funds, by taxation, etc., etc.; and also the power of the Federal Government to aid the State, discussed.

The proceedings to condemn the land in this case are not such judicial proceedings taken by the Federal Government as must be had in the Federal Courts, because this is not a proceeding by the United States, but by the State of California, exercising her sovereign power, not substantially for the benefit of the ·United States, but primarily for the benefit of the people of the State—the agent of the Federal Government being merely the instrument at whose relation the sovereign power is invoked. The act of taking the property is the act of the State.

Nor is this a suit "at law or in equity," nor a suit arising under or having relation to the Constitution or laws of the United States; but it is a proceeding arising under the laws of California, and there is no law disabling the Federal Government from enjoying a benefit, or urging a claim of this sort in the Courts of the State, when the State permits it.

The right to the land in this case is given by direct act of the Legislature, and not by judicial proceedings—these proceedings being mere modes of ascertaining the compensation to be made to the owner.

*Query.* Whether the Federal Government can take and appropriate land within a State for "forts," etc., without the aid or sanction of the State.

The act of the Legislature under consideration in this case, provides "due process of law" for taking private property for public uses.

The provision of our Constitution that "just compensation" be made for private property taken for public uses, only requires that a certain and adequate remedy be provided by which the owner can obtain his compensation without unreasonable delay; and the provisions here that a jury be impanneled to assess the value of the land and damages, that the money be paid into the County Treasury for the use of the owner, to be paid to him when his ownership is ascertained by a Court of competent jurisdiction, are adequate and constitute "due process of law."

The duties imposed upon the District Judge, by the act in question, are judicial.

APPEAL from the Seventh District.

The following were the proceedings in this case:

*The Application of Jeremy F. Gilmer, Captain of Engineers in the Army of the United States of America, and Special Agent of the said United States, for the Condemnation of Lime Point, for Fortification Purposes.*

Jeremy F. Gilmer, Captain of Engineers in the Army of the United States of America, specially authorized hereunto by the said

United States applicant, by his attorney, Calhoun Benham, respectfully shows to the Honorable the District Court of the Seventh Judicial District, in and for the county of Marin and State of California, that the said United States have been and now are desirous of purchasing a certain tract of land, situated within the limits of the said State and hereinafter described, for the erection of fortifications thereupon—a public use for which the said tract is neces-sary and indispensable ; that Samuel R. Throckmorton, a resident of the city of San Francisco and State aforesaid, is. the owner of the said tract, and is capable of conveying the same to the United States ; that as the said applicant is informed and believes, a disagreement in price has occurred and now exists between the said Throckmorton and the United States concerning the said tract and purchase thereof, in this : the said Throckmorton has demanded, and now demands, the sum of $200,000 for the said tract, and has declined and now declines to take any less sum than $200,000 therefor, and the said United States have refused and now refuse to give the said Throckmorton the said sum for the said tract, although they have been and are now willing to give a reasonable price less than $200,-000 therefor, which said last mentioned sum they allege is an unreasonable and excessive price for the said tract ; that from and on account of the said disagreement in price, the said Throckmorton, as the said applicant is informed and believes, has refused and now refuses to convey the said tract to the United States, although often requested so to do ; that the said United States now, and by virtue of the proceedings hereby instituted and to be conducted in this behalf, propose to purchase said tract ; And the said tract lies on the northern side of the entrance to the bay of San Francisco, is situated in the county of Marin and State of California, and is bounded and described as follows : beginning at a point on the most eastern rock seen above water, of a ledge of rocks extending into the bay of San Francisco from the wooded hill connecting with the high spur which limits the cove of Saucelito to the South, and which point is designated by a copper bolt marked " O," being the initial point of the survey : (here follows a description according to a survey) containing 1,899 66-100 acres of land ; the above described tract being more particularly shown in the map made by

Wm. J. Lewis, and on file in the office of the United States Engineers, San Francisco.    All the courses hereinbefore given are true and not magnetic.    The survey referred to in the foregoing description is one heretofore made of the said tract of land by Wm. J. Lewis, and now on file in the office of the United States Engineers, in San Francisco, in said State.

Wherefore, the said applicant demands that the Judge of the said Court shall order notice of this application to be published in some newspaper nearest to where said land lies; also in one newspaper published in the city of San Francisco; also, after being translated into the Spanish language, in a newspaper printed in that language, if any there be, which is published in said District, once in each week for the space of four months in each such paper, which notice shall contain an accurate description of the said land, together with the name of the owner, and shall require all persons interested in the said land to come forward in the said Court, on Friday, the — of March next, and file their objections, if any they have, to the proposed purchase of the said tract.

And the said applicant further demands, that on the — day of March next, the said Court shall empannel a jury, in the manner now provided by law, to assess the value of said land and all damages which shall be sustained by the said Throckmorton or others, by reason of an appropriation of the said tract to the said United States.

And the said applicant further demands, that when the value of the said tract and the damages hereinbefore mentioned shall be assessed by the jury which is to be empanneled in this behalf, the said Court shall adjudge the said tract to be condemned to the use of the said United States, upon the payment of the said value and the said damages, so as aforesaid assessed, together with the entire costs of the proceedings, into the treasury of the county where such proceedings are had.

(Signed)    Calhoun Benham,<br>Attorney for Applicant.

The petition was verified by Captain Gilmer.

Throckmorton filed the following plea:

" And now comes Samuel R. Throckmorton and pleads to the juris-diction of the Court.    And for his plea he denies the existence of any jurisdictional fact authorizing the proceeding attempted by the applicant herein; and he specially pleads that the United States do not now desire to purchase the land mentioned, having already, by an agreement evidenced by writing, purchased the same from this appearer on the nineteenth of February, 1858, by and through the action of P. Della Torre, Esq., late District Attorney of the United States, duly authorized and empowered in that behalf by the Secretary of War, the whole pursuant to an Act of the Congress of the United States, passed March 3d, 1857.

"And this appearer denies that he has ever refused to convey said land to the United States; he expressly avers that no one in their behalf has ever tendered to him any sum of money as the purchase price or equivalent of said land, different from that which he originally charged therefor, and which the Government of the United States, after much negotiation, and after being duly advised in the premises, agreed in writing to pay him; and he expressly denies that that sum of money has been tendered him, though the United States has frequently promised the same, in compliance with their duty pursuant to the contract of sale aforesaid.    And further this appearer pleads, that, hereby expressly reserving his lawful right to recede from the contract aforesaid, should the conduct of the United States touching said contract make it his interest and his privilege so to recede, he has ever been and now is willing and able to convey said lands, in strict pursuance of the contract aforesaid. And he further pleads that the law of California of February 14th, 1859, entitled ' an act for the relinquishment to the United States, in certain cases, to title of lands, etc., and site of light-houses,' etc., is unconstitutional, null and void.

"And he asks that the application for an order of publication be rejected."

Subsequently, the notice required by the act was published in the " San Francisco Herald," for four months, according to an order of Court.

At the time specified in the notice for the appearance of all persons intending to object to the condemnation and purchase, to wit:
16

March 15th, 1861, Barton Ricketson filed an intervention, claiming an interest in the land, by way of privilege or lien, for $35,000, and joining in all the allegations of Throckmorton.

From the recital in the judgment, it seems that Parrot and Dallas also intervened, though no plea by them appears in the record.

The United States District Attorney then joined issue as to the constitutionality of the Act of the Legislature of Feb. 14th, 1859, mentioned in the plea of Throckmorton; and averring the use named in the application herein, to be a "public use," within the Constitution of the State of California.

The case having been heard upon these issues of law, the Court rendered judgment sustaining the plea of Throckmorton, that the Act of the Legislature of Feb. 14th, 1859, upon which the proceedings are founded, is repugnant to the Constitution of the State of California and void, and dismissing the application. Applicant appeals.

*Gregory Yale* and *Calhoun Benham,* for Appellant.

I. The power of eminent domain, by which the State takes private property for public uses, exists in the Constitution of this State. (Const. sec. 8, art. 1.) And the provision there for "just compensation," is simply a limitation upon the exercise of the power. (Sedg. Const. Law, 405–8, 533; 3 N. H. 535; 3 Hill, 100; *Stark* v. *McGowan,* 1 N. & McC. 387; 1 Bald. C. C. 229; Pierce on American R. R. Law, 147; Thayer's Essay in September and October Numbers Law Reporter, vol. 19.)

II. The Legislature, and not the Judiciary, is the exclusive judge of the occasions when this right can be exercised. (Raleigh & Gaston, R. R. Co., 2 Dev. & Batt. 467; Sedg. Const. & Stat. L. 513; 19 Law Rep. 248, 253; 24 Barb. 665; 4 Pick. 463; 7 Greenl. 272; 16 Pick. 101; 23 Id. 395; 3 Paige Ch. 73; 4 Hill, 151; 18 Wend. 68.) And that a fort is for a "public use," the Legislature has decided by the act.

III. The exclusive right to judge of the purposes, includes, necessarily, the right to say whether a foreign State or corporation could have the use of private property for a public purpose in the State. (24 Barb. 664, 665, 669; *Bank of Augusta* v. *Earl,* 13

Pet. 519.)   But the United States is not a foreign corporation, in any sense.   The property thus acquired, it is true, would be held by the Government as a proprietor, but it would be appropriated for national purposes alone, in which the people of the State would have the use by the protection afforded.

"A public exigency need not be one which affects all equally; it can never do that; nor one which affects all directly; nor one which in point of fact affects all to any extent.   It is enough, for many purposes, that there be merely a local exigency."   (19 Law Rep. 254, Sept. 1856.)

In the exercise of this right, the public land of the United States can be taken, as well as that of an individual.   (Pierce R. R. Law, 151.)   The only limit to the exercise of the power is to provide compensation.   The particular mode is not prescribed; nor the mode of ascertaining the value.   (1 Bald. C. C. 229; *Koppikus* v. *State Capitol Commissioners*, 16 Cal. 249.)

The right of eminent domain does not exist in the United States, without the consent of the State.   But one attempt has ever been made by Congress to enact any general law on the subject.   (Cong. Globe; part 2, 1859–60, 1790–2; Cong. Globe, part 4, 3396; see also 7 Dana, 113; 7 Pet. 243, 251.)

IV.   The objection that compensation must be made before the land is appropriated is untenable.   It is sufficient if a certain and adequate remedy is provided, by which the individual can obtain his compensation without unreasonable delay.   (*Rogers* v. *Bradshaw*, 20 Johns, 735; *Jerome* v. *Ross*, 7 Johns Ch. 344; 18 Wend. 17, 77, 328.)

V.   The duties imposed by the act upon the District Court, are judicial; and although they might be performed by the executive or legislative department, this fact does not incapacitate a Judge from performing them.   (3 Paige, 73; 18 Wend. 50; 1 Id. 102.)

*E. L. Goold,* for Respondent Throckmorton.

I.   The Legislature cannot take the property of one person, even with compensation, and bestow it upon another, where the public interest is not concerned in the transfer.   (*Beekman* v. *Saratoga R. R.*, 3 Paige; Thomas' Universal Jurisprudence, 171;

*Bloodgood* v. *M. & H. R. R. Co.*, 18 Wend. 14–56; 11 Id. 150; *Varick* v. *Smith*, 5 Paige, 137; *Charles River Bridge* v. *Warren River Bridge*, 10 Pet. 642; *Wilkinson* v. *Leland*, 2 Id. 657; 4 Hill, 147.)

The right to take private property is the eminent domain, and it must be taken for public use. Vattel (sec. 1, ch. 22) thus defines it: " Le droit qui appartient a la societe, ou au souverain, de disposer, en cas de necessite et pour le salut public de tout bien renferme dans l'Etat, s'appelle domain eminent. Ce droit fait partie du souverain pouvoir." Or, as the Supreme Court of the United States have rendered this definition: " The right which belongs to society or to the sovereign, of disposing, in case of necessity and for the public safety, of all the wealth contained in the State, is called the eminent domain. It is evident that this right is, in certain cases, necessary to him who governs, and is, consequently, a part of the empire or sovereign power." (*Pollard's Lessee* v. *Hagan*, 3 How. 223.)

The law in question proposes to take this land and transfer it to the Government of the United States. There is no pretense that California needs it. If the Legislature can do this, it can transfer the land to any individual or to any other Government. The Government in such cases is treated as an individual. (1 Blac. Com. 140; 18 Wend. 56.)

The eminent domain is the right to dispose of all the wealth contained within a State for the public welfare; and this means the welfare of that public whose own immediate government exercises the right, and not the welfare of another public, though the two may, for certain purposes, be blended. The public that takes must be the public which is to use. The Government of California and the Government of the United States are governments separate and distinct as are those of Austria and Russia. Each within its own sphere is sovereign. Though, for certain purposes, they are blended, still their individuality remains, and the lines that separate and divide them no candid observer has any difficulty in tracing. The Federal Union is a governmental entity, a government proper, with ample powers of attack and resistance, and with all the insignia of governmental individuality. These two powers,

compared with each other, present all the distinctive features of two governments which, though designed to promote the welfare of one people, are endowed with forces and characteristics so marked and defined as to enable us to appreciate them separated from each other with as much ease as if they were the embodiment of the strength of nations geographically distant from, and wholly alien to each other.

The eminent domain is to be exercised for the benefit of that community of individuals whose organs set the powers in motion. The aggregation of individuals, "called society," says to one of its number: "You must surrender your private property to us, as we wish to employ it for the benefit of all of us." On making the surrender, the citizen has a right to suppose that his associates will keep the property, and see to its employment for the immediate advantage of all.

But the direct opposite of this is proposed by the law in question. The people of the State of California do not propose to keep the property for one instant of time. They propose to bestow it upon another. They take it from the owner—immediately cast it from them, and lose all control over it. They do not employ it for the advantage of the owner and themselves—together constituting the commonwealth. They do not want it, and therefore their agents, the Legislature, have no power to take it.

The true theory of the eminent domain is, that it is the right in the community of the resumption of private property. (18 Wend. 13; 1 Bouv. L. Dic. 511; 2 Kent, 340.) This theory makes the commonwealth the source of all title, and gives to the property a State origin. The people of the State propose now to resume it, and incorporate it with the mass of their other possessions. For the purpose of employing it for the common good? No. For the purpose of transferring it to a new owner. If this law be enforced, both the owner and the people of the State become strangers to the title, and the only use to which it is put by the people of the State, after they have resumed it, is to find a purchaser for it. But all writers on public law unite in denying the existence of any such power as that. A public use is a public benefit, but a public benefit is not, necessarily, a public use.

It is not enough to justify the taking of land for a manufactory, for example, that the public welfare will be promoted by encouraging manufactures. We all know it will do so; but that is not sufficient. If it were, then the land could be taken from A and bestowed on B; for the taking would be a taking for public use. And the test is: could the public compel the proprietor of the manufactory to permit any participation in the enjoyment of the property?

It is said the citizens of California have an indivisible share in the benefit resulting from the use of this property. But this is immaterial. They have no such share as California citizens. In common with other citizens of the United States, they have. As such, they are members of another public. But this does not satisfy the terms of the expression, "public use;" for the conferring of a benefit, whether indivisibly or entirely, can well take place, and yet there be no public use. For example: If our increasing commerce should make it for the public advantage to have lighthouses on the coast of Oregon, and that State should propose to build them, and for that purpose prefer the building stone on Angel Island, could the Legislature take the building stone for that object? It cannot be denied that a benefit would be conferred, both upon Oregon and ourselves. And yet the taking of a portion, or the whole, of Angel Island, with compensation, to bestow it upon Oregon for a purpose productive of a very great benefit to our population, would not be tolerated. The phrase "public use" has a fixed, well ascertained meaning. It is not to be confounded with "public utility," "public interest," "common benefit," or "popular use," for banks, insurance companies, and the, like, are used by the public. Public use means a daily disposition of the property by the people of the commonwealth in their aggregate capacity, to be enforced, if necessary, by the exercise of power. Popular use means the occasional and precarious enjoyment of the property by the members of society in their individual capacities—without the power to enforce such enjoyment according to law. (Angell on Water Courses, 40.)

The power to take private property for public use implies exclusive power to regulate that use; without the power to compel, con-

trol and regulate the use, there is no power to take. And this is the test of this question, and the turning point of the case. The plaintiff does not present himself as the agent of the Federal Government, seeking in its behalf to exercise the eminent domain. He avows himself not only the Federal agent, but also the instrument or agent of the commonwealth of California in her exercise of this power. And it is said the Federal Government or its agents may be deputed to represent California in this behalf, since it is no unusual thing for a State to act in the expropriation of private property by means of private associations or bodies corporate. For the purposes of this controversy, Captain Gilmer and the Federal Government are to be considered as one. And the question is: Can a State depute the General Government to exercise the eminent domain?

·In the dissenting opinion of Senator·Tracy, in *Bloodgood* v. *M. & H. R. R. Co.*, 18 Wend. 70, it is urged that none but political organs or officers of State may enforce this right on behalf of the State.

This is the first cause that came before the Court of Errors of New York touching the power to expropriate private property for railroad purposes, and it is instructive, as showing the criterion by which the power in question is to be judged of. The criterion is this, viz: If the State or sovereign power take the property and keep control over it, so, as to compel its devotion to the purpose avowed in expropriating it, then the taking is for a public use. If not, the taking is for a private. use, and by implication forbidden by the organic law.

The opinions of the members of the Court in favor of the constitutionality of the law recognized the difference between a taking of private property with the power and the design to retain control over it, and so guarantee the public use, and a taking for a purpose over which the State abandoned its control. Other authorities are to the same effect. (4 Met. 566; 7 Pick. 495; 4 Wheat. 676; Angell & Ames on Corp. 748.)

But should the State give the General Government the right to take this property, no power could compel her to use it for a fort. The work, if begun, could be left off at pleasure, or it might never be begun.

It is thus seen that the proposed disposition of this property is radically different from that in the cases in which the State has made use of companies, individuals and corporations as its instruments in exercising the eminent domain.

" In all cases where lands have been, or shall hereafter be conveyed to or for the United States for forts, arsenals, dock-yards, light-houses, or any like purpose, or in payment of debts due the United States, which shall not be used or necessary for the purposes for which they were purchased, or other authorized purpose, it shall be lawful for the President of the United States to cause the same to be sold for the best price to be obtained, and to convey the same to the purchaser by grant or otherwise." (Act of Congress of April 28th, 1828, 4 Stat. at L. 264.) And thus, property of growing value would have been taken at an original price, and its increase would accrue neither to the former owner nor to the people of the State. The government can use land acquired of a citizen in the erection and mantling of public works, or it can sell land so acquired. It may do either. It has done both. Its option in this regard is emancipated from all control. It holds the land free from shackles of the State. If it may sell the property to a new comer in defiance of the power of the State, then the property is taken, not for public use, but to make merchandise of it, and a legal enactment, justifying that, would seem fashioned in the interest and for the promotion of public plunder, rather than for the protection of life, liberty and property.

Therefore, neither the plaintiff, Captain Gilmer, nor his principal, the Federal Government, can be held to be an instrument of the State in exercising the eminent domain; for, if either could be, the property would continue to be subject to the same power of eminent domain. The power is not extinguished by its exercise over a given piece of property. Land- taken for a turnpike and paid for, may be again taken from its new owner for railroad or other purposes and conferred upon a fresh owner; and it may be again taken from him even, and from his successors in the title, and as long and often as the public exigencies may require. To the exercise of this power there is no limit save and except the public necessity and the public welfare. *Salus populi est suprema lex.*

But, could the State resume from the General Government a tract of land or other property ? The attempt would be preposterous ; and this brings out in bold relief the radical difference between a taking by the instrumentality of a company or corporation, and that by means of an officer of the Federal Government. The latter does not take under the eminent domain, since one purpose of his taking is to deprive the members of that political society in whom the eminent domain resides of all power over and participation in the employment, the use and the enjoyment of the property. It can never be again subjected to the eminent domain, no matter by what mutation of events its use should become necessary to the people of this State.

It is said the Legislature has determined that the use avowed by the plaintiff is a public use, and that this declaration is conclusive upon all the world.

The authorities quoted do not sustain the position taken. They prove that when the Legislature decides that the public exigencies require the exercise of the eminent domain, the Courts have no power to review the decision. But this begs the question here. The courts must determine whether, in the given case, the elements of a public use exist and combine. The Legislature is to select the time at which they shall be availed of. The law-maker cannot, by his mere *fiat*, create a public use. It must exist independently of his will, though it rests with him to recognize its existence and enforce it for the good of society. (18 Wend. 62 ; 2 Kent, 338.) I conclude: 1st. That the Legislature is powerless to take the property of one individual and bestow it upon another, with or without compensation, and of course equally so to transfer it to another political society or artificial person.

2. That in the acquisition of property by contract, the United States puts off her governmental panoply, and descends to the *status* of an individual or artificial person.

3d. That the right and power continuously to control the destination and employment of property is elemental to the right to take it against the owner's consent. That the power to direct and compel the use is vital to the power to take, and neither can exist without the other.

4th. That property is not, in legal language, devoted to public use, because individuals belonging to the political society participate in its enjoyment; or because, by the disposition and employment of the property, a benefit, great or small, is conferred upon the whole society. But the term "public use" is a term of fixed meaning in the language of jurisprudence, and comprehends a taking by a certain political society, for a use by that society, for the benefit of that society.

5th. And, finally: as the organs of the political society that propose to take this property do not design to retain, to use, to employ, or to control it, but do design so to dispose of it as that another political society may be free to make use of it, or sell it, as may seem best, the purpose is clearly not to exercise the eminent domain, but to despoil a citizen by compelling one of his tracts of land to change owners.

*H. P. Hepburn, John H. Saunders* and *John W. Dwinelle*, for John Parrott and A. G. Dallas, Intervenors and Respondents.

If the State of California can take the land of Throckmorton and transfer it to the United States, as is attempted here, it is by virtue of her right of eminent domain, and two things must concur: first, it must be the sovereign power that acts; second, the act must be necessary for the public interest, neither of which is true in the present case. As to what is the right of eminent domain, see Cooper's Justinian, 441; Puff, *b* 8, chap. 5, sec. 7; 2 Kent, 339; Rice's R. 392; Domat L. 1, title 8, sec. 1; Grotius, *b* 1, chap. 1, sec. 6; 2 Johns. Ch. 162; 11 Pet. 642; Puff, 829; Burlamaqui, 150.

The State of California is not sovereign. If she did unite within herself all the powers of sovereignty, she could take the land in dispute. But under the Constitution of the United States, the powers of the Federal Government, though limited to specified objects, are plenary as to those objects, and the supreme law; and the powers not delegated to the Federal Government are reserved to the States respectively. In other words, between the States and United States there is a division of sovereignty; to the former are allotted the general or national, and to the latter the internal or

Gilmer *v.* Lime Point.

municipal powers of 'sovereignty. The powers which are lacking in the one find their complement in the other, and between the two the sovereignty is complete ; and amongst the first duties imposed upon Congress is that of providing for '" the common defense and general welfare," and to do this Congress is authorized " to raise and support armies, to provide and maintain a navy, to declare war," and as an incident to the power to make war, they may purchase places for public uses, and erect forts, arsenals, dock yards, navy yards, magazines, etc. (3 Story on Con. 150.) From this it is apparent that the whole subject of national defense is confided exclusively to the National Government, for there is no mode of defending a country except by men, ships and fortifications. But, as if to remove every doubt as to the exclusive nature of the power, the Constitution prohibits to any State to keep troops or ships of war in time of peace, or engage in war unless actually invaded. Moreover, from the nature of the subject—the national defense—there would be an obvious repugnancy in confiding it to a single State. Accordingly, no State at any time in the history of the Government has ever maintained an army, owned a ship, or built a fortification. To do any one of these things would be to meddle with the common defense, and this was surrendered by the States to the United States. Then if the State of California cannot build or hold a fortification, how can it appropriate and condemn private property for that purpose ? This can be done only in the exercise of a sovereign power, but for the purpose for which this power is to be exercised, the State of California is not sovereign for the reason that the United States is.

But it may be objected that the State has always exercised the right of eminent domain, and that it is now too late to question it. The answer is, that the right is not denied, but the extent of it. The right exists both in the States and in the United States. With the former it is limited to internal, municipal objects, over which the States are sovereign—to open a street, to construct a canal, to build a state house, a prison, or the like ; with the latter it is limited to external, national objects, over which the United States are sovereign—to erect a light-house, to build a fort, or establish a post road. The two Governments forming together only one sovereignty,

they can each exercise the same sovereign power, provided it be in subordination to the Constitution of each. For example, Congress is authorized to impose and collect taxes. This does not interfere with the power of the States to tax for the support of their own Governments, nor is the exercise of that power by the States an exercise of any portion of the power that is granted to the United States. (*Gibbons* v. *Ogden*, 9 Wheat. 1.) Therefore the State of California might assert a right of eminent domain in taking a lot of ground for a penitentiary, when it would have no right to take it for a fortification; and *e converso*, the United States could well exercise the right in taking a lot of ground for a fortification but not for a penitentiary. The right of both rests on the same basis, the sovereign power; and the power being limited, the limit of the right is the limit of the power. (*Pollard's Lessee* v. *Hagan*, 3 How. 222, 223, 224, 230, which observes the distinction between national and municipal eminent domain throughout the whole case.)

It has also been objected that the Federal Government has never exercised, in a single instance, the right of eminent domain. The nonuser of a power is no evidence of its nonexistence. The reason why the eminent domain has never been asserted, has been partly because there was no occasion for it—the United States being always willing to buy and the citizen always willing to sell—and partly out of consideration to the jealousy of State rights partisans. The power " to establish post offices and post roads " is interesting to the entire nation, but it has never been exerted for the reason that the States have always permitted to the Federal Government the use of its roads for post roads. (*Dickey* v. *Maysville Road Co.*, 7 Dana, 135.) " Suppose," to use the language of Mr. Justice Story, " a State should prohibit a sale of any of the lands within its boundaries by its own citizens, for any public purposes indispensable for the Union, either military or civil; would not Congress possess a constitutional right to demand and appropriate land within the State for such purposes, making a just compensation ? " (3 Story on Con. 46, 117.)

To this it may be objected that the intention of the State of California, in taking this land, is to transfer it to the United States. The answer is that the United States is not beholden to the State

of California for leave to fulfill her high mission to her people. She is her own sovereign, and not a borrower of the sovereignty of others. The question is one of power, and not of the end to be accomplished by the exercise of it. If the State can condemn the land for the United States, it can condemn it for itself. To put the power in the State is to deny it to the United States, and thus the National Government, though charged with the duty of providing for the common defense, would be deprived of the power of performing that duty.

II. This property, if taken, will not be for the public use of the State, or the people of California.

The right of taxation and the right of eminent domain, are substantially the same. They are both sovereign, and they both take private property for public use, with .this single difference, that taxation takes from every citizen in equal proportions, whilst the eminent domain takes not a portion, but the whole of a given thing or property. But the condition of this latter right is that the sovereign who takes shall pay the value of the thing taken to the owner, and thus what would otherwise be a burden on one individual, is made to fall equally on every member of the State. In other words, except that a specific thing is appropriated, there is no difference. So far as the public is concerned, the situations in both cases are identical; both result in a tax, and both are imposed in equal proportions and for a like motive—the public interest.

Where then is the right of the State of California to tax its people for United States forts? The fort is for a public use, but a public use, not of one State, but of thirty-four. If the tax can be imposed for the site of a fort, it can be imposed for its construction; and if for a fort, with equal reason for a ship of war, or an army; and thus the burthen of the national defense may be shifted from the people of the nation, to the people of a single State. The phrase " public use " in the United States Constitution, means " a *national* public use," and in the Constitution of California, a " municipal public use." (*Barron* v. *Mayor of Baltimore*, 7 Pet. 243 ; 8 Wend. 85 ; 1 Bald. 220.)

*Sol. A. Sharp,* for Hood, Davidson, and Young, Executor of the

estate of Robert Walkinshaw, deceased, Intervenors and Respondents.

The principle upon which the State delegates the power of the eminent domain to individuals and corporate bodies is, that the State makes use of them as agents or trustees for the purpose of working out the power. But in such cases the State does not lose dominion over that portion of its territory subjected to the eminent domain; on the contrary, the jurisdictional power is retained, and the agent or trustee is compelled to use the land for the public purpose for which it was needed. (*Swan* v. *Williams*, 2 Gibbs, [Mich.] 435.)

The powers of the General Government are enumerated in the Constitution. The faculty of becoming an agent or trustee for a single State is not among them; and, therefore, the General Government cannot be an agent. When private property is wanted for the use of the General Government, as provided by the Constitution, these officers and agents use the Federal name, and exert its power as a principal and not as a substitute.

The theory of complainant necessarily is, that the General Government being the agent of the State, and he being agent of the General Government, his acts are authorized by law. But if the State cannot make the General Government an agent, the complainant cannot be a subagent. Nor can he be the agent of the State; for the State has not proposed to use the property in question. On the contrary, the State, by the Act of April 16th, 1859, expressly abandoned its jurisdiction over this property in favor of the General Government. For the plea shows the property has already been acquired by purchase.

The cases speak of the power to compel a railroad company to use the property for the purpose mentioned. It is said that this is because there may be a private railroad; but that the demand for a tract of land for a fort implies a public purpose, since there can be no private fort.

This begs the question. The test is not " what does the claimant propose to do with the land," but " can he be forced to do with it what he proposes ? " True, he may say he wishes it for a purpose which is, in its nature, public. But when he gets the property, if he may

use his option in applying it to a purpose not public, then this taking is not a taking for " public use " within the meaning of the law.

The case in twenty-fourth Barbour is not in point. The corporation there was made by legislation substantially a part of the State Government of New York; and the land, after being taken, remained liable to taxation, and was wholly subject to the power of the State; which made the corporation its mere instrument in carrying out a public purpose. By coming into the State, the corporation became *quoad* the property taken, a domestic corporation. For by incorporating itself into the State machinery, its foreign character became merged, and it submitted wholly to the power of the State.

BALDWIN, J. delivered the opinion of the Court—FIELD, C. J. and COPE, J. concurring.

The Legislature having passed the following statute, (see Statutes of 1859, 26) and certain proceedings having been taken under it, the only question argued before us is the constitutionality of this act.    The act is in these words:

" Sec. 1. That whenever it shall be made to appear to any one of the District Courts of this State, upon the application of any authorized agent of the United States, that the said United States are desirous of purchasing any tract of land, and the right of way thereto, within the limits of this State, for the erection of a lighthouse, beacon light, range light, fortifications, navy yard, or other military or naval purposes, and that the owner or owners of said lands are unknown, nonresidents or minors, or from any other cause are incapable of making a perfect title to said lands, or in case the said owners, being residents and capable of conveying, shall, from disagreement in price or any other cause whatever, refuse to convey said lands to the United States, it shall be the duty of the Judge of the District Court in which the lands so designated to be purchased are situated, to order notice of the said application to be published in some newspaper nearest to where said lands lie, also in one newspaper published in the city of San Francisco, once in each week, for the space of four months, which notice shall contain an accurate description of the said lands, together with the names of

the owners, or supposed owners, and shall require all persons interested in the said lands to come forward, on a day to be specified in said notice, and file their objections, if any they should have, to the proposed purchase ; and, at the time specified in said notice, it shall be the duty of said District Court to impannel a jury, in the manner now provided by law, to assess the value of said lands, and all damages sustained by the owner of the lands so appropriated, by reason of such appropriation ; which amount, when so assessed, together with the entire costs of said proceedings, shall be paid into the county treasury of the county in which said proceedings are had, and thereupon the Sheriff of the said county, upon the production of the certificate of the Treasurer of said county that the said amount has been paid, shall execute to the United States, and deliver to their authorized agent, a deed of the said land, reciting the proceedings in said cause, which said deed shall convey to the United States a good and absolute title to the said lands, against all persons whatsoever.

" Sec. 2. That the money so paid into the county treasury shall there remain, until ordered to be paid out by a Court of competent jurisdiction.

" Sec. 3. It shall be the duty of the Judge directing money to be paid to a county Treasurer, in accordance with the provisions of this act, to require of such Treasurer a bond in double the amount of money ordered to be paid to him, with two or more sufficient sureties, to be approved by said Judge. Said bonds shall be payable to the people of the State of California, for the use and benefit of such persons, severally, as are entitled to said money ; said bonds to be executed, approved and filed with the Clerk of said Court, before receiving said money.

" Sec. 4. In addition to the publication required by this Act, if there be a newspaper published in the Spanish language in the Judicial District where such land is situated, said notice shall also be published in such newspaper for the length of time herein provided. In all cases of publication of notice under this act, the Court shall require the same proof as in cases of the publication of notice under the Civil Practice Act of this State.

" Sec. 5. That an Act authorizing the United States to purchase

lands for public purposes, approved March 10th, 1857, be and the same is hereby repealed."

The constitutionality of this statute is assailed on two principal grounds, going to the whole body and effect of it, and upon several minor grounds, for alleged defects in the frame of the act.

The main questions involved are new in this Court, and in other Courts; for the research of the learned counsel has not enabled them to find any authoritative decisions bearing directly on the propositions argued in their relations to the same facts as those, or similar facts to those presented by this record.

An argument has been made on the vexed question of the relative powers of the State and Federal Governments; but we do not deem it necessary to consider at much length these matters, as the conclusion to which we have arrived is, as we conceive, entirely consistent with any theory which statesmen or jurists have assumed in regard to this subject.

Two propositions are made by the respective counsel for respondents, which seem to be inconsistent, but which tend to the same result. The first is, that the right of eminent domain does not exist in the United States with respect to property in a State, and that a State must exercise this right for her own proper if not exclusive use, and not for the use of another Government.

The second is, that as fortifications, navy yards, etc., are for the use of the Federal Government, Congress alone can exercise the right of eminent domain in taking property for such public use.

The first proposition assumes this shape in the argument: that the eminent domain is in the State of California; that the United States Government is only a proprietor, not a sovereign, when it owns land within the limits of the State; that the sole power of condemning land for public purposes, following the ultimate dominion or sovereign prerogative, resides in the State authorities, and this power must be exercised by the State for its own purposes, and cannot be transferred by it to a foreign government, as the United States in this respect is; and that the public purposes contemplated by the Constitution, as those for which the power of condemnation is to be exercised, are those purposes in which the State or its people are exclusively interested; or, at least, those purposes which

17

the State, by her own Constitution, is bound, or is allowed, to protect and subserve. It is ingeniously argued in this connection that to the Federal Government is entrusted, as its peculiar province, the power of war and the duty of the common defense ; and that, following this power and duty, are the providing by that Government of the means of war and defense ; and that, therefore, it is no part of the duty of the State, as such, to assist in this end or these means ; and hence the conclusion is reached that the State government, as to these matters, has no public interest to subserve ; since these ends or means are not public purposes of the State of California, within the meaning of the Constitution. Before proceeding to answer this argument directly, the importance of the subject will justify us in going into an examination of the origin and nature of this power, and of the extent to which it has been carried by the Courts, and the character of the subjects to which it applies.

Sovereignty, according to the best authorities, is the supreme power which governs the body politic or society that constitutes the State. And this power is independent of the particular form of government, whether monarchical, aristocratic, or democratic. (Wheat. Elem. Int. Law, pt. 1, ch. 2, sec. 5.) To each and every sovereignty belong certain rights which are deemed essential to its existence. These are called by the civilians *jura majestatis*, or rights of sovereignty. Among them is the *jus eminens*, or the supreme power of the State over its members and whatever belongs to them. When applied to property alone, it is called the *dominium eminens*, or the right of eminent domain ; that is, the right of the sovereignty to use the property of its members for the public good or public necessity. The word *necessity*, in this connection, is not to be used in too limited a sense ; it means a want, an exigency, an expediency, for the interest or safety of the State. (Vattel, liv. 1, ch. 20, sec. 224 ; Cooper's Justinian, 456 ; Bowyer Universal Pub. Law, 227, 372 ; Beekman R. R. Co., 3 Paige, 73 ; 3 Story on Const. 117.) Although the right of levying taxes upon private property generally in the State, results from, and is part of, the right of eminent domain, that term, in its more modern acceptation, applies especially to the taking of some particular private

property for some particular public use.    (2 Kent. Com. 339.) This right is inherent in government ; and is, perhaps, inseparable from the idea of sovereignty.    It is not given by the State Constitutions, but is restrained and regulated by them upon the implied recognition of its preëxistence.    The phrase employed in our Constitution is : " Nor shall private property be taken for public use without just compensation."    The words, " public use " here, mean a use which concerns the whole community, as distinguished from a particular individual or a particular number of individuals.    It is not necessary, however, that each and every individual member of society should have the same degree of interest in this use, or be personally or directly affected by it, in order to make it public. (See 19 Law Reporter, September, 1856, 254, 256, and cases cited.)

The objects for which this right is most commonly exercised are public roads, streets, turnpikes, railroads and canals, and in a large majority of these cases the works are to be constructed and owned, not by the State, but by some municipal or other corporation—just as the fort in this case is to be constructed and owned by the United States.    If the use for which the property is taken be to satisfy a great public want or public exigency, it is a *public use* in the meaning of the Constitution, and the State is not limited to any given mode of applying that property to satisfy the want, or to meet the exigency.    The power which is authorized to take is also empowered to appropriate, or apply the thing taken to the use designated.    Hence it may itself make the application, or it may make it through the instrumentality of others.    Where private property is taken for the purposes of railroads, aqueducts, canals, turnpikes, etc., the State usually makes the application through the agency of private corporations, to which she transfers the ownership of the property taken.    And it seems not to be important whether the corporation through whose instrumentality the object is to be attained be a domestic or foreign corporation.    (*Varrick* v. *Smith*, 3 Paige, 45 ; *R. R. Co.* v. *Davis*, 2 Dev. and Bat. 451 ; 2 Gibbs, 447 ; 2 Kent's Com. 339 ; *Morris C. and B. Co.* v. *Townsend*, 24 Barb. 665.)

In determining whether the exercise of the power be called for

in any given case, it is held by many authorities of great weight that the Legislature is the conclusive judge of the public necessity or advantage. (*Com.* v. *Breed*, 4 Pick. 483 ; *Spring* v. *Russell*, 7 Greenl. 272 ; 6 Pick. 10 ; 23 Pick. 395 ; 3 Paige, 73 ; 4 Hill, 151 ; 24 Barb. 665 ; see also 19 Law R. 248, 253, where the whole subject is discussed with much learning and ability.)

Judge Redfield, in his excellent work on Railways, 112, 113, says : " And it would seem that notwithstanding this right of sovereignty may reside in the United States as the paramount sovereign, so far as the Territories are concerned, in reference to internal communication by highways and railways, and notwithstanding the ownership of the soil of a portion of the lands by the United States, in many of the States as well as Territories, still, when any of the Territories are admitted into the Union as independent States, the general rights of eminent domain are vested exclusively in the State sovereignty." He cites *Pollard* v. *Hagan*, 3 How. 212 ; *Goodtitle* v. *Kibbe*, 9 How. 471 ; *Doe* v. *Beebe*, 13 Id. 25 ; *United States* v. *Railway Bridge Co.*, 6 McLean, 517.

The case in McLean is a long and well reasoned case, in which the venerable Judge holds that the State, by virtue of her eminent domain, has the right to take the land of the United States for the purpose of a road—holding the United States for all such purposes to be a mere subordinate proprietor. The case of *Illinois Central Railroad* v. *W. S.*, (reported in 20 Law Reporter, 630) decided in the United States Court of Claims, is referred to in a note to the text in Redfield as an authority to the same effect.

Having premised this explanatory matter, we proceed to the principles applying more directly to the propositions before us. It has been seen that the Constitution is general in its language: " Private property shall not be taken for public uses without compensation." But no definition is given of public uses. We have seen, however, that this public use need not be a use general or common to all the people of the State alike. It may be a use in which but a small portion of the public will be directly benefited, as a street in a town, a bridge or a railroad, necessarily local in its benefits and advantages, though it must be of such a character as that the general public may, if they choose, avail themselves of it. It has also

Gilmer v. Lime Point.

been seen that it is not essential to meet the requirement, that the use or benefit should be exclusively for the people of the State, or even a portion of those people.    This was held in the case in New York, (24 Barb., and other cases before cited) and we can see no answer to the proposition that the people of California have no right to complain that the people of Oregon are also benefited by a public improvement, or that such improvement would be any the less a public use in California because it was also useful elsewhere.    It has also been observed that it is not necessary the State should herself make the improvement or be interested in it after it is made. She may and usually does transfer, or permit the transfer to, and vest the control of the work to which the property is auxiliary in others.    These transferees, usually corporators, are the instruments by which the State works out this public use, or accomplishes the public benefit designed.    The State taking this action, acts as sovereign.    As such sovereign, she owns or has the dominion over the property of her citizens.    It is true, that in consequence of the limitations of our peculiar system, this dominion is not absolute; but this feature makes nothing in this place against the general argument; for it is not proposed to take this property against, but subject to these limitations.    Every free government protects the property of the subject, and no government provides stronger safeguards than ours for such individual rights.    But these rights are no more absolute and unlimited than the rights of the Government. It is a cardinal principle of our law that private property is sacred to the lawful uses and disposition of the owner; that it is his to do with as he pleases, to keep, to use, or to sell, subject to a few simple qualifications.    But government has *its* rights and *its* duties, which are equally essential to the State and to the people as are these proprietary rights to the citizen.    Important as are the interests of each man, they must sometimes yield to the interests of all; and the Government, which acts for the whole, must be permitted to work out its general object, though sometimes at the expense of the natural rights of individuals.    But in exercising this paramount power the Constitution wisely guards the citizen from oppression, and therefore has prescribed a principle of justice for the regulation of State action.    When she interposes this sovereign dominion over

private property, she makes adequate compensation to him for what she takes of his separate property for the benefit of the general society.   In this manner his interest is made consistent with the power and efficiency of the Government and with the common weal. It is impossible to prescribe the number or character of objects upon which, or for which, this sovereign power may take effect. The State being supreme in respect to the mass of governmental powers—indeed, in respect to all not expressly granted to the Fed-· eral Government, or as means to the expressly granted powers— has this right to take the property within her jurisdiction for the general good.   The ultimate title may be said to be in her, for it is by her laws that it is protected, that it assumes the character of, and has value as property, and by which it is regulated in its tenure and transmission; and it escheats to her upon a lapse of title by incapacity to hold or forfeiture.   The Federal Government does not, in any respect, represent the title of private property in a State, or primarily control it as a sovereign acting by its own orig- inal authority.   It can pass no law controlling the title or descent of real estate in California belonging to the citizens of this State, unless, indeed, it be in exceptional cases, (if any such exist) which make nothing against the general argument, denying that govern- ment the usual control or dominion as the general sovereign author- ity.   The power, therefore, to take being unquestionable, and the State being, as the local sovereign, the proper authority by whom this power is to be usually exercised, it devolves upon the respond- ents to show that the particular case made by this record is an exception to the general power.   It is not questionable that a fort, if not a necessity of Government, is an object of public use ; nor do we think it admissible of doubt that the State might, for its own purposes, condemn land for a fort ; for as, at least with the consent of Congress, it can raise an army, and is charged with the duty of executing its own laws, which may require military force, so it could provide an arsenal, forts and barracks, in which, or by which, mili- tary operations might be facilitated.   When we admit the end to be within the limits of State authority, we must concede those means which are the proximate and natural instruments for its accomplish- ment.   If these proceedings had been taken at the instance of the

State and for her own purposes, it is therefore impossible for us to see any objection to this exercise of her authority. But we are met by the objection here that the act in question shows a different purpose; that the condemnation is for and on behalf of the United States. It has been seen that "the public use" may be worked out through the instrumentality of a foreign corporation, and that this use may have relation to any purpose, civil or military, within the compass of the State authority, which subserves the general interest. The only test and criterion of the admissibility of the power are that the particular object tends to promote the general interest, in its relation to any legitimate object of government. The Government selects its own agents and agencies in the promotion of this purpose. And whether that agency be a foreign or domestic corporation, and *a fortiori* a foreign Government or a member of the domestic Government, would seem to be immaterial. But we do not regard the Government of the United States a foreign Government. It is true, it is a Government independent of the State Government, moving in a different sphere from that of the State Government, and with a different class of powers, distinct but not antagonistical, and operating upon and within the circle of its powers supreme over the same constituents. But we cannot perceive why the State Government may not as well use the Federal Government as an agent in promoting this public end, as she could use a corporation created by and existing within a different jurisdiction. The people of California are as much interested in being defended against public enemies, foreign or domestic, whether the defense comes from soldiers of the Federal Government or from soldiers of the State, and it is as much a public use to the people of this State to have the United States Government garrison the fort that protects their main harbor as to garrison it themselves, and none the less a public use to them, because this fort, thus garrisoned, may be a part of a general system of defense to the entire Confederacy. Though the particular fort contemplated may be of indirect general benefit to the whole nation, it is of direct and peculiar benefit to this portion of it. But it is answered that this State cannot give these proceedings for the benefit of the United States, because that Government is supreme as to this subject of national defense

and its incidents, and is independent of State aid, opposition or authority. This involves the second proposition which we will consider in this connection.

To make the argument good, it must go further. It must be shown, not only that the Federal Government has the power to condemn this land, but that it has the *exclusive* power to condemn it, by its own direct action. If it has this exclusive power, we must look for it in the Federal Constitution, in some express provision to that effect, or in something auxiliary to an express provision. We have found nothing of this sort. If the State had the power to take land for public purposes such as this, she retains it unless it can be shown that she has parted with it. The Federal Government, it is true, can declare war, and to it is intrusted the duty of the general defense against foreign invasion; but nothing is said in the Constitution as to the condemning of land for forts. Can it be maintained that the State government is prohibited all aid to the Federal Government in execution of the undisputed powers of the latter? Might not the State lend the Federal Government the State credit to prosecute a war? Might she not lend her the State funds? Might she not, having the general power of taxation, levy a tax, though the money raised was designed for the benefit of the General Government? Might she not let her jails, penitentiaries, etc., be used by the officers of the United States Government? Or her public roads and highways for the post routes of the Government? And might not the Federal Government, in return, afford facilities and aid to the State Government in the administration of their duties and functions? Is it any answer to say, that these Governments, as respect each other, are independent, separate and distinct? Why may not favors, or benefits, or assistance, be bestowed or received from distinct Governments as well as by or from the several constituents or representatives of the same Government? The question is not whether they are distinct, but it is whether being distinct, there is, from that cause or any other, an incapacity in one to give, or in the other to receive a particular benefit, or to give or to accept, as in this case, a particular agency legitimately given, or accepted as to other parties. A foreign corporation is distinct from the Govern-

ment of a State other than that of its institution; so is a citizen independent of a foreign sovereignty; but this does not prevent the sovereignty from making them agents if it has jurisdiction of the subject of the agency; nor does it prevent them from accepting the agency. The United States are in no way disabled by express inhibition from accepting this agency of taking title to land of which the State of California is the ultimate proprietor, to subserve a public use to her citizens; and the State is in no way disabled from giving it. The State takes it for *her* interest—which is to have her soil defended; she gives it to a Government which may receive it in consideration of its duty to defend the State; and the State, having a public interest in this defense, secures the attainment of the object by transferring to the Federal Government this means of performing its national obligations. It is precisely because the Federal Government *is* bound to defend the State, that the State is authorized to coöperate with the Federal Government in securing the means of that defense. The State could neither delegate to the Federal Government a portion of her own peculiar powers, nor could she receive from that Government any of the powers of the latter, for powers of the Government are not alienable by the agents. But this is not the question; nor is the question, whether she could exercise her powers for the benefit of the Federal Government, even if at the same time she was benefited, and that Government assented to her acts. Even this is not the true question. It is, cannot the State exercise a power primarily for her own benefit—that being a public use—through the agency of the Federal Government, although the Federal Government is to receive by the agency assistance in executing its general duties? There is a wide distinction between the State's delegating a power to the Federal Government, and retaining and exercising the power for the benefit of herself and of that Government. Some powers are exclusive in the Federal Government—some concurrent with the States; but powers do not usually depend on the purpose for which they are exercised; thus the Federal Government may lend money to the States, as, in form, was the case in the distribution of the proceeds of the sales of the public lands; but this is not to trench upon the province of the State Governments in furnishing

the revenue for their own support; so Congress has donated lands for the support of schools, and swamp lands to the States; this has been to assist the State by the exercise of the power of the Federal Government in their own administrations; but no one supposed that it was unconstitutional to give or receive this assistance. Precisely in this light do we regard the exercise of the power in question. The State has a general right to condemn land to public use; she may select her own agent to accomplish this public end; she *has* selected the United States Government as such agent; the Government is capable of undertaking the trust and receiving the title; this public use is a use to the State; neither the Constitution of the State nor that of the United States forbids the Federal Government from taking, or the State from granting this right; and the rights and interests of the citizens are as fully protected as if the State took the land for her own peculiar purposes. This statement answers the argument, that judicial proceedings, instituted by the Federal Government, must be taken in the Courts of the United States, and that the State Courts have, and can take no jurisdiction. For, if we concede that such proceedings as these under this inquisition of damages be judicial proceedings, that is, a " suit at law or in equity," within the meaning of the rule invoked; and if we concede further that they constitute a matter arising under the Constitution or laws of the United States, still the answer is, that this is not a proceeding by the United States, but a proceeding by the State, exercising her sovereign power, not substantively for the benefit of the United States, but primarily for the benefit of the people of the State, the agent of the Federal Government being merely the instrument at whose relation or by whose act this sovereign power is invoked. The act of taking the property is the act of the State, the act owing its whole force to her will, and is exercised for her own benefit, though the policy or interest of the Federal Government is also subserved; yet this incidental result does not change the character of the act as the exercise of sovereign authority by the State, and for her own purposes. But even if this were not so, the proceeding is not a suit " at law or in equity," nor a suit arising under, or having relation to, the Constitution of the United States or the

laws thereof; but it is a proceeding arising under the laws of the State of California; and we know of no rule of law which disables the Federal Government from enjoying a benefit, or waging a claim of this sort in the Courts of the State, when the State, by her own action, gives the benefit or allows the claim to be prosecuted by the Government in her own forum.   It may be remarked, however, that the right to the land, or to take the land, is given by direct Act of the Legislature, and not by judicial proceeding; that the proceedings are mere modes of ascertaining the sum due for the land thus allowed to be taken; and, though no divestiture of title is caused by the direct and sole operation of the Act, but this follows only after the course of proceedure is perfected, the same may be said of every condition precedent; in other words, the appropriation is the act of the Legislature, not the judgment of a Court, though this appropriation only is rendered complete upon a compliance with certain precedent conditions.

The general argument is not weakened, if we concede that the Federal Government might take and appropriate this property without the aid or sanction of the State.  Upon this question we express no opinion, for it is not necessary ; since this power, if it exist, is not exclusive in the Federal Government; and if it were, as we have already argued, we see no objection to the Federal Government prosecuting its right through the instrumentality of the legislative act which executes the power, and promotes the interest of the State, and secures the right of the United States and of its own citizens.   These views dispose of the case upon the principal questions submitted.

It is said that a distinction exists between giving this right to a foreign corporation and giving it to the Federal Government, in this : that in the first case, the State can still control the property for the benefit of the public, and to secure the use; while in the last, it passes forever from her jurisdiction and control.   But if this last statement be true in point of fact, without the express cession of jurisdiction to the Federal Government over the fort grounds so taken, we cannot see that this fact makes any difference in principle.   The right to take is not necessarily connected with retaining a power of control after the appropriation ; this power rests on

a different ground; and it is for the State to prescribe the terms on which the property shall be taken or used, subject only to the constitutional provision as to compensation. It may be considered a sufficient guarantee that the Federal Government will use the property in the right way, that such is the implied obligation of the Government, or that its interest or its duty will so direct.

The other points touch only the details of the act, which supply the machinery by which this right of the State is sought to be effected. The able argument of the counsel for the United States has dispelled whatever doubts we felt upon the question as to the sufficiency of the security to the owners or claimants of this land. We may briefly remark: first, with respect to the provisions of the law for a "just compensation." We think this law has provided a certain and adequate remedy by which the owner of the private property taken can obtain his compensation, without unreasonable delay. This is all that can be required. (*Rogers* v. *Bradshaw*, 20 Johns. 735.) Again, the objection that no "due process of law" is provided in this act, is, we think, entirely untenable. It was suggested in the argument, but evidently not relied upon. The act certainly provides a "process of law" for the taking of private property for these public uses, and we think it is a due and adequate process. It is made the duty of the Court to impannel a jury in the manner provided by law, to assess the value of the land, and all damages sustained by the owner thereof, whereupon the Judge is to direct the money to be paid into the county treasury for the use of the owner, and to be paid out to him when his ownership is ascertained by a Court of competent jurisdiction.

It is further objected, that the duties imposed upon the Judge in these proceedings are not judicial, and that therefore he cannot legally be required to perform them. We think the function here to be discharged by the Judge, are in their nature judicial; he summons the parties, hears and decides upon legal objections, directs the impannelling of a jury, receives their verdict, makes orders; in short, conducts a judicial inquiry. (18 Wend. 102.)

Judgment reversed and cause remanded for further proceedings.